1    *COUNSEL LISTED ON SIGNATURE PAGE*

2

3                **UNITED STATES DISTRICT COURT**

              **NORTHERN DISTRICT OF CALIFORNIA**

4

                 **SAN JOSE DIVISION**

5

6   PERSONALWEB TECHNOLOGIES, LLC      Case No. 5:13-cv-01317-EJD

7   and LEVEL 3 COMMUNICATIONS, LLC,

                            **DEFENDANTS' MOTION FOR**

8               Plaintiffs,           **JUDGMENT ON THE PLEADINGS**

9         v.                            Date: Feb. 6, 2020

                               Time: 9:00 a.m.

10   GOOGLE LLC, ET AL.,             Before: Hon. Edward J. Davila

11              Defendants.       Courtroom: 4, 5th Floor

12

13   PERSONALWEB TECHNOLOGIES, LLC      Case No. 5:13-cv-01356-EJD

   and LEVEL 3 COMMUNICATIONS, LLC,

14                             **DEFENDANT'S MOTION FOR**

             Plaintiffs,          **JUDGMENT ON THE PLEADINGS**

15

16         v.                            Date: Feb. 6, 2020

                               Time: 9:00 a.m.

17   FACEBOOK, INC.                 Before: Hon. Edward J. Davila

              Defendant.        Courtroom: 4, 5th Floor

18

19   PERSONALWEB TECHNOLOGIES, LLC      Case No. 5:13-cv-01358-EJD

   and LEVEL 3 COMMUNICATIONS, LLC,

20                             **DEFENDANTS' MOTION FOR**

21              Plaintiffs,         **JUDGMENT ON THE PLEADINGS**

22   v.                             Date: Feb. 6, 2020

                               Time: 9:00 a.m.

23                                Before: Hon. Edward J. Davila

24   EMC CORPORATION and VMWARE, INC.,   Courtroom: 4, 5th Floor

                        Defendants.

25

26

27

28

1

2

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 3

        A.      The Asserted "True Name" Patents ................................................... 3

        B.      Procedural History ............................................................................. 5

III.    LEGAL STANDARDS........................................................................................ 7

        A.      Judgment on the Pleadings................................................................. 7

        B.      Patent Eligibility Under Section 101................................................. 8

IV.     ARGUMENT ....................................................................................................... 9

        A.      The '310 Patent ................................................................................ 10

                1.      The Asserted Claims of the '310 Patent Fail *Alice* Step
                        One Because They Are Directed to an Abstract Idea. ......... 11

                2.      The Asserted Claims of the '310 Patent Lack Any
                        "Inventive Concept" as Required Under *Alice* Step Two. .................. 14

        B.      The '280 Patent ................................................................................ 18

        C.      The '662 Patent ................................................................................ 22

V.      CONCLUSION.................................................................................................. 24

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Affinity Labs of Texas v. Amazon.com Inc.*,
 838 F.3d 1266 (Fed. Cir. 2016) .................................................................................21

*Akamai Techs., Inc. v. Digital Island, Inc.*,
 No. 1:00-cv-11851-RWZ (D. Mass.) ..........................................................................4

*Alice Corp. v. CLS Bank Int'l*,
 134 S. Ct. 2347 (2014) ..................................................................................... *passim*

*Altnet Inc. v. RIAA*,
 No. 2:04-cv-07456-JFW-CT (C.D. Cal.) .....................................................................4

*Altnet Inc. v. Streamcast Networks Inc.*,
 No. 2:06-cv-05086-ODW-E (C.D. Cal.) ......................................................................4

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
 788 F.3d 1371 (Fed. Cir. 2015) ...................................................................................8

*Atlas IP LLC v. Pac. Gas & Elec. Co.*,
 No. 15-CV-05469-EDL, 2016 WL 1719545 (N.D. Cal. Mar. 9, 2016) ...................16

*Bilski v. Kappos*,
 561 U.S. 593 (2010) ............................................................................................15, 17

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
 319 F. Supp. 3d 818 (E.D. Va. 2018) ........................................................................12

*BSG Tech LLC v. Buyseasons, Inc.*,
 899 F.3d 1281 (Fed. Cir. 2018) ...................................................................................9

*Cable & Wireless Internet Servs., Inc. v. Akamai Techs., Inc.*,
 No. 1:02-cv-11430-RWZ (D. Mass.) ..........................................................................4

*Citrix Sys., Inc. v. Avi Networks, Inc.*,
 No. 17-cv-1843-LPS, 2019 WL 582480 (D. Del. 2019) ......................................20, 21

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
 776 F.3d 1343 (Fed. Cir. 2014) ..............................................................................8, 17

*CyberSource Corp. v. Retail Decisions, Inc.*,
 654 F.3d 1366 (Fed. Cir. 2011) .............................................................................13, 19

*Digitech Image Techs. v. Elecs. for Imaging, Inc.*,
 758 F.3d 1344 (Fed. Cir. 2014) .................................................................................18

*Electric Power Grp., LLC v. Alstom S.A.*,
 830 F.3d 1350 (Fed. Cir. 2016) ...................................................................................9

*Gottschalk v. Benson*,
 409 U.S. 63 (1972) .......................................................................................................8

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
    189 F.3d 971 (9th Cir. 1999)...................................................................................7

*Intellectual Ventures I LLC v. Capital One Bank*,
    792 F.3d 1363 (Fed. Cir. 2015)......................................................................15, 18

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    200 F. Supp. 3d 565 (W.D. Pa. 2016) ...............................................15, 17, 21, 24

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017)......................................................................13, 19

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2017)........................................................................8, 13

*Jericho Sys. Corp. v. Axiomatics, Inc.*,
    No. 3:14-CV-2281-K, 2015 WL 2165931 (N.D. Tex. May 7, 2015) ................ 13-14

*Kinetech, Inc. v. The Lime Grp., Inc.*,
    No. 2:07-cv-06161-VBF-PLA (C.D. Cal.)..................................................................4

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ..............................................................................................8, 9

*Neptune Generics, LLC v. Eli Lilly & Co.*,
    921 F.3d 1372 (Fed. Cir. 2019)..............................................................................7

*Nichia Corp. v. Vizio, Inc.*,
    No. 16-cv-00545-SJO, 2017 WL 3485767 (C.D. Cal. Feb. 2, 2017) ......................16

*OpenTV, Inc. v. Apple Inc.*,
    No. 14-CV-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015)....................12

*OpenTV, Inc. v. Apple Inc.*,
    No. 5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ...............3, 14

*PersonalWeb Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017)................................................................................6

*PersonalWeb Techs., LLC v. Apple, Inc.*,
    917 F.3d 1376 (Fed. Cir. 2019).....................................................................6, 7, 16

*In re PersonalWeb Techs., LLC, & Level 3 Commc'ns, LLC, Patent Litig.*,
    MDL No. 2834, 340 F. Supp. 3d 1373 (U.S. Jud. Pan. Mult. Litig. 2018)...............4

*Preservation Wellness Techs. LLC v. Allscripts Healthcare Solutions*,
    No. 2:15-CV-1559-WCB, 2016 WL 2742379 (E.D. Tex. May 10, 2016) ...............13

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
    696 F. App'x 1014 (Fed. Cir. 2017) .................................................................2, 13

*Protegrity USA, Inc. v. Netskope, Inc.*,
    No. 15-cv-02515-YGR, 2015 WL 6126599 (N.D. Cal. Oct. 19, 2015)............. 12-13

*RecogniCorp LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017)..............................................................................9

*Smartflash LLC v. Apple Inc.*,
    680 F. App'x 977 (Fed. Cir. 2017) ........................................................................ 2-3, 12, 13

*Smart Sys. Innovations v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017) ..................................................................... 9, 14-15, 21, 24

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) ..................................................................................... 18

*In re TLI Commc'ns, LLC Patent Litig.*,
    823 F.3d 607, 613 (Fed. Cir. 2016) .............................................................................. 17

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ................................................................................... 9, 15

*Umbanet, Inc. v. Epsilon Data Mgmt., LLC*,
    263 F. Supp. 3d 647 (E.D. Tex. 2017) .................................................................... 13, 17

*Ventress v. Japan Airlines*,
    486 F.3d 1111 (9th Cir. 2007) ........................................................................................ 7

## FEDERAL STATUTES

35 U.S.C. § 101 ....................................................................................................... *passim*

35 U.S.C. § 102 ................................................................................................................. 5

35 U.S.C. § 103 ................................................................................................................. 5

35 U.S.C. § 311 ................................................................................................................. 7

## FEDERAL RULES

Fed. R. Civ. P. 12 ............................................................................................................. 7

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that on February 6, 2020, at 9:00 a.m., in Courtroom 4 of this Court located at 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendants EMC Corporation ("EMC"), VMware, Inc. ("VMware"), Facebook Inc. ("Facebook"), and Google LLC ("Google")[1] (collectively, "Defendants") shall and hereby do move for an order entering judgment on the pleadings.  This Motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Marissa A. Lalli, and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.  Plaintiffs PersonalWeb Technologies, LLC ("PersonalWeb") and Level 3 Communications, LLC ("Level 3") (collectively, "Plaintiffs") oppose this motion.

## STATEMENT OF RELIEF REQUESTED

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, Defendants request that this Court enter judgment for Defendants on Plaintiffs' allegations of patent infringement because the asserted claims are drawn to non-patentable subject matter under 35 U.S.C. § 101 ("Section 101").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Abstract ideas with no inventive concept are not eligible for patent protection under Section 101, and any patent claiming such subject matter is invalid as a matter of law.  *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014).  The asserted claims of U.S. Patent No. 7,802,310 ("the '310 patent"), No. 6,415,280 ("the '280 patent"), and No. 7,949,662 ("the '662 patent") (together, "the True Name patents") cover precisely such abstract ideas.

Specifically, the True Name patents focus on the idea of using content-based identifiers to manage data in a computer system.  In the asserted claims of the '310 patent, this content-based identifier is used to control access to a file or other data item.  In the asserted claims of the '280

---

[1] Plaintiffs had also accused YouTube, LLC of patent infringement; however, those allegations have been dropped, leaving Google LLC as the only defendant in Case No. 5:13-cv-01317-EJD.

patent, the identifier is used to request files that are distributed across a network.  And in the asserted claim of the '662 patent, the identifier is used to mark files for deletion.

There is nothing new about these basic ideas.  Libraries have long used catalog systems built around the idea of a unique, content-based identifier[2] assigned to each book—making it easier to identify, manage, and control access to materials in their collections.  Patrons can request items using those identifiers in the library catalog, and the library can control access to those items based on the same identifiers.  For example, patrons with a valid library card may borrow a modern copy of *The Odyssey*, but only those with special rights may access an antique printing housed in a library's rare-books collection.  Librarians may also use their catalogs to identify duplicate books to remove from their collections.  This idea of using unique identifiers—including identifiers based on the contents of the material—to request, control access to, and delete information is at the core of the claims of the asserted True Name patents.

These abstract ideas, as they appear in the patents, are not patent eligible; they merely represent generic applications of known concepts.  And these ideas do not become patent eligible because the identifiers are created from the file contents using hashing technology (long known in the art), much less because they are implemented using generic computer technology.  Nothing in the asserted claims adds an inventive concept to these abstract ideas.  *See Alice*, 134 S. Ct. at 2358.

As the Supreme Court has repeatedly confirmed, "[l]aws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)) (internal quotation mark omitted).  In fact, multiple courts have already addressed whether abstract ideas similar to those claimed here are patentable.  The answer, every time, has been "no."  For example, the Federal Circuit has confirmed that the abstract ideas of "providing restricted access to resources," *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017), and "conditioning and controlling access to

---

[2] A "content-based identifier" is simply an identifier that is based on the content of the information identified.  For example, libraries use call numbers—such as those in the Dewey Decimal Classification and Library of Congress Classification systems—to assign each item a unique identifier based on its subject matter and other identifying information.  These call numbers are similar to the "content-based identifiers" recited in the True Name patents and will change as the content changes (e.g., when a new edition of the book is released).

data," *Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982 (Fed. Cir. 2017), are ***not*** patentable.  And this Court has found that "[t]he practice of controlling access to information by verifying credentials (via well-known encryption methods) is neither novel nor specific to" certain applications.  *OpenTV, Inc. v. Apple Inc.*, No. 5:15-cv-02008-EJD, 2016 WL 344845, at *5 (N.D. Cal. Jan. 28, 2016).  Accordingly, the Court should invalidate the asserted claims of the True Name patents under Section 101 and dismiss Plaintiffs' infringement claims with respect to these patents.

## II.     BACKGROUND

### A.     The Asserted "True Name" Patents

The three asserted patents are part of a larger family of patents that Plaintiffs call the "True Name" patents.  The True Name patents all share the same specification and all focus on the use of "substantially unique" content-based identifiers to perform basic functions.  '310 patent at 3:30-4:59.[3]  The True Name patents claim priority to abandoned U.S. patent application No. 08/425,160, filed on April 11, 1995—long before the Supreme Court's decision in *Alice.  See, e.g.*, *id.* at (60).

In the background section of the patents, the inventors claimed that prior art systems identified files or other data items based on their location or address within a data system (for example, a file's location in a file directory as set forth in a path such as C:\DOCS\LETTER.TXT).  According to the inventors, this meant that "there is no direct relationship between the data names and the data item."  '310 patent at 2:39-40.  Identical data files could thus have different names, leading the system to store unnecessary duplicate copies.  *Id.* at 3:4-9.

The True Name patents purported to solve these problems by creating unique, content-based identifiers for the data items to be managed, generated by applying a "hash function" (i.e., a mathematical algorithm) to the data in each particular data item.  *See, e.g.*, '310 patent at 3:50-4:59 (Summary of the Invention); *id.* at 12:21-26; *id.* at Abstract; *id.* at 40:7-14 (claim 24).  The patents refer to the claimed identifiers as "True Names."  *Id.* at 6:20-24.  The hash functions described in the patents—which were well known in the prior art—reduce the contents of the data item to "a relatively small, fixed size identifier," so that the identifier is "virtually guaranteed to represent the

---

[3] For convenience, this summary cites to the specification of the '310 patent.  Identical disclosures appear in both the '280 and '662 patents.

data [item] and only [the] data [item]." *Id.* at 12:21-26.  As a result, identical data items will have the same identifier, while different data items will likely (although not certainly) have different identifiers.  *Id.*  As the Patent Office has since confirmed, multiple times over, using hash functions to generate content-based identifiers was actually long known in the art.  *See infra* Sections II.B and IV.A.2, pp. 5-6, 16.

The asserted patents acknowledge that these True Names are intended for use with "existing" operating systems and "standard" data-management processes.  '310 patent at 6:25-32.  In the asserted claims of the '310 patent, the identifiers are used to determine if access to a data item is licensed or authorized.  *See, e.g.*, *id.*, claims 24, 81, 86.  In the asserted claims of the '280 patent, they are used to request files that are distributed across a network.  *See, e.g.*, '280 patent, claims 15, 31. And in the asserted claims of the '662 patent, they are used to de-duplicate files.  *See, e.g.*, '662 patent, claim 33.  The specification also describes using the identifiers for locating data items ('310 patent at 3:59-62), accessing data items (*id.* at 4:10-12), performing backups (*id.* at 35:13-25), restoring data items that have been lost or destroyed (*id.* at 35:20-22), eliminating duplicate data items (*id.* at 27:20-23), and checking whether a particular data item is already in the system before uploading another copy (*id.* at 14:1-11).  All of these tasks are run-of-the-mill data-management features using content-based identifiers in place of other identifiers.[4]

---

[4] Because of the breadth of the True Name patents, Plaintiffs and prior owners have asserted them against numerous defendants in a variety of industries.  First, from 2000-2003, prior owners to the True Name Patents targeted Akamai, a content delivery network.  *Akamai Techs., Inc. et al. v. Digital Island, Inc. et al.*, No. 1:00-cv-11851-RWZ (D. Mass.); *Cable & Wireless Internet Servs., Inc. et al. v. Akamai Techs., Inc.*, No. 1:02-cv-11430-RWZ (D. Mass.).  Then, from 2004-2007, prior owners targeted entities involved with music file-sharing technologies, including the Recording Industry Association of America ("RIAA"), Streamcast, and LimeWire.  *See Altnet Inc. et al. v. RIAA et al.*, No. 2:04-cv-07456-JFW-CT (C.D. Cal.); *Altnet Inc. et al. v. Streamcast Networks Inc., et al.*, No. 2:06-cv-05086-ODW-E (C.D. Cal.); *Kinetech, Inc. et al. v. The Lime Group, Inc. et al.*, No. 2:07-cv-06161-VBF-PLA (C.D. Cal.).  Then, after acquiring the patents in 2011, Plaintiffs leveled infringement accusations at storage and cloud-computing companies, including the Defendants here and Autonomy/HP, Caringo, Dropbox, NEC, Apple, IBM, Microsoft, and Yahoo.  Most recently, Plaintiffs sued several dozen companies based on their use of Amazon's cloud-computing technology.  *See In re PersonalWeb Techs., LLC, & Level 3 Commc'ns, LLC, Patent Litig.*, MDL No. 2834, 340 F. Supp. 3d 1373 (U.S. Jud. Pan. Mult. Litig. 2018).

1      **B.      Procedural History**

2              In late 2013, after Plaintiffs filed each of the instant cases in the Eastern District of Texas,

3      EMC and VMware filed a series of petitions for *inter partes* review ("IPR") with the Patent Trial and

4      Appeal Board ("PTAB"), challenging all claims that had been asserted against them for six of the

5      True Name patents, including the '280 and '662 patents, under 35 U.S.C. § 102 and § 103.  The

6      PTAB subsequently invalidated all challenged claims of all six patents.  *See* Joint Status Report,

7      *PersonalWeb v. EMC*, ECF No. 61 (June 24, 2019).  The IPR proceedings and related Federal Circuit

8      appeal confirmed—indisputably—that the idea of using a content-based identifier for data-

9      management purposes was not novel or inventive.  *See* Ex. A[5] (Final Written Decision for U.S.

10     Patent No. 5,978,791) (invalidating claims to use of content-based identifier for identifying and

11     accessing data items); Ex. B ('280 Final Written Decision) (invalidating claims to use of content-

12     based identifier for requesting files distributed across a network); Ex. C ('662 Final Written Decision)

13     (invalidating claim to use of content-based identifier to record deletion of files); Ex. D (Final Written

14     Decision for U.S. Patent No. 7,945,539) (invalidating claims to use of content-based identifier for

15     accessing different portions of files); Ex. E (Final Written Decision for U.S. Patent No. 7,945,544)

16     (invalidating claim to use of content-based identifiers for comparing files); Ex. F (Final Written

17     Decision for U.S. Patent No. 8,001,096) (invalidating claims to use of content-based identifiers for

18     storing and accessing file segments).  The record developed at the PTAB confirmed the lack of

19     novelty of the purported inventions of the True Name patents.  The PTAB stated:

20     - The prior art disclosed creating "unique identifiers" for data items, including "using a
         binary hash algorithm" to calculate an identifier "from the content of the data instead
21       of from an external or arbitrary source."  Ex. A ('791 Final Written Decision) at 15;
         *see also id.* at 54; Ex. D ('539 Final Written Decision) at 20 (prior art "discloses that a
22       unique identifier for a file is calculated using a hash function (e.g., MD5, a
         cryptographic hash function) on the entire contents of the file, rather than the file's
23       location").[6]

24     - The prior art disclosed using content-based identifiers, based on a hash function, to
         access data items.  Ex. A ('791 Final Written Decision) at 15-16; *id.* at 64-65

25

26

       _____

27     [5] All citations to "Ex. __" are to the Declaration of Marissa A. Lalli, filed herewith.

28     [6] The patent claims refer variously to "hash" and "message digest" functions.  As the True Name
       specification confirms, "message digest" functions (such as MD5) are a type of hash function.  *See,
       e.g.*, '310 patent at 12:22-13:9.

---

(describing prior art and crediting expert opinion that "it was old and well-known to access records stored in a database using their identifiers").

- The prior art disclosed using content-based identifiers, based on hash functions, to identify duplicate files. Ex. C ('662 Final Written Decision) at 15; Ex. A ('791 Final Written Decision) at 16.

- The prior art disclosed using content-based identifiers, based on a "hash of contents" of a data item, to "identify and request" the data item. Ex. B ('280 Final Written Decision) at 17.

The Federal Circuit affirmed each of the PTAB decisions cited above. *See* Ex. G, Judgment, *PersonalWeb Techs., LLC v. EMC Corp. & VMware, Inc.*, Nos. 2014-1602, 2014-1603, 2014-1604, 2014-1605, 2014-1606, 2014-1607 (Fed. Cir. Aug. 10, 2015).[7]

Apple also filed a separate IPR challenging the '310 patent.[8]  The IPR was instituted, and the PTAB twice issued final written decisions that the asserted claims were unpatentable.  The Federal Circuit ultimately reversed—but ***not*** based on the novelty of the content-based identifiers *per se*. Instead, the court relied on the narrow ground that the particular prior art at issue did not sufficiently disclose comparing the content-based identifier to a plurality of identifiers (as opposed to a single identifier). *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1382-1383 (Fed. Cir. 2019). But the Federal Circuit acknowledged that:

- The prior art disclosed generating an identifier for a data item based on the contents of the data item. *PersonalWeb Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 989 (Fed. Cir. 2017) ("Woodhill discloses a system for using content-based identifiers in performing file-management functions, such as backing up files.  It includes a distributed storage system that identifies data items (called 'binary objects') using content-based identifiers (called 'binary object identifiers').  A binary object identifier is calculated using the contents of a data item." (citation omitted).).

- The prior art also disclosed using unique identifiers to control access to data items. *See id.* ("Stefik discloses an authentication system designed to control access to digital works stored in a repository.  Each digital work is assigned a 'unique identifier.'  Each digital work also has associated usage rights that control access to the work.  A user demonstrates authorization to access a digital work through a 'digital ticket,' which

---

[7] Independent claim 10 of the '280 patent was invalidated by the PTAB but claims 15 and 16 that depend therefrom were not at issue in the related IPR.  Claims 31 and 32 were challenged in an IPR by Rackspace, which the PTAB instituted, but that IPR was terminated after settlement.  Similarly, independent claim 25 of the '662 was invalidated in an *ex parte* reexamination but no reexamination was instituted as to asserted claim 33.

[8] The '310 patent was also challenged in IPR proceedings by Rackspace US Inc., which had been sued by Plaintiffs in parallel infringement actions.  Although the PTAB instituted IPR proceedings with respect to numerous claims of the '310 patent—including all claims asserted in this case—those IPRs were terminated following a settlement.

identifies the ticket holder as having access to the digital file because the holder has paid for access or is otherwise entitled to access." (citations omitted)).

On appeal, PersonalWeb argued that the asserted prior art did not inherently disclose comparing one identifier with a plurality of identifiers. *See PersonalWeb*, 917 F.3d at 1381.

Because Section 101 challenges are not available in IPRs, the patent eligibility of the True Name patents has not yet been decided. *See Neptune Generics, LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019); 35 U.S.C. § 311(b) (limiting scope of IPR arguments).

In sum, following the IPRs, the cases against these Defendants resumed, with the allegations narrowed to the following claims:

- '310 patent claims 24 and 31 (EMC and VMware);
- '310 patent claims 81, 82, and 86 (all Defendants);
- '280 patent claims 15 and 16 (Facebook, Google, and YouTube);
- '280 patent claims 31 and 32 (Facebook); and
- '662 patent claim 33 (Google and YouTube).

## III.   LEGAL STANDARDS

### A.   Judgment on the Pleadings

Under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The Court should allow such a motion "when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law."  *Ventress v. Japan Airlines*, 486 F.3d 1111, 1114 (9th Cir. 2007) (quoting *Fajardo v. County of L.A.*, 179 F.3d 698, 699 (9th Cir. 1999)) (internal quotation marks omitted).  In deciding such a motion, the Court may consider the pleadings, documents incorporated by reference in the pleadings, and matters of judicial notice.  *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 995 (N.D. Cal. 2014); *see also Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) ("When considering a motion for judgment on the pleadings, this court may consider facts that 'are contained in materials of which the court may take judicial notice.'" (citation omitted)).

**B.        Patent Eligibility Under Section 101**

The Patent Act limits patentable subject matter to "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  The Supreme Court has long held that, under this provision, "[p]henomena of nature, … mental processes, and abstract intellectual concepts are ***not*** patentable, as they are the basic tools of scientific and technological work."  *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972) (emphasis added); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (collecting cases).  The Supreme Court's 2014 decision in *Alice Corp. v. CLS Bank Int'l* amplified this precedent, confirming that claims for abstract ideas are not patent eligible unless they are "transform[ed]" by an inventive concept.  134 S. Ct. 2347, 2357 (2014).

In both *Alice* and the earlier *Mayo* decision, the Supreme Court laid out a two-step process for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  *Alice*, 134 S. Ct. at 2355.  ***First***, the court "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.*; *see also Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1375 (Fed. Cir. 2015).  Abstract ideas include—but are not limited to—"longstanding commercial practice[s]" and "method[s] of organizing human activity."  *Alice*, 134 S. Ct. at 2356; *see Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2017) ("[T]he category of abstract ideas is not limited to economic or commercial practices or methods of organizing human activity."); *id.* at 1314 n.5 (collecting cases on abstract ideas); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("[W]e agree with the district court that the claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory.").

***Second***, if the claims are directed to a patent-ineligible concept, such as an abstract idea, the court then searches for an "inventive concept"—that is, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Alice*, 135 S. Ct. at 2355 (alteration in original) (quoting *Mayo*, 566 U.S. at 73).  In the second step, the court must examine the "elements of each claim both individually and

1    'as an ordered combination.'"  *Id.* (quoting *Mayo*, 566 U.S. at 79).  A process that merely "involve[s]

2    well-understood, routine, conventional activity" does not survive step two.  *Mayo*, 566 U.S. at 73.

3    "To save a patent at step two, an inventive concept must be evident in the claims."  *RecogniCorp,*

4    *LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).  Further, when searching for the

5    "inventive concept" at step two of *Alice*, the focus must turn to "whether the claim limitations ***other***

6    ***than the invention's use of the ineligible concept*** to which it was directed were well-understood,

7    routine, and conventional."  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir.

8    2018) (emphasis added).

9          Moreover, as the Supreme Court explained, "if a patent's recitation of a computer amounts to

10   a mere instruction to 'implemen[t]' an abstract idea 'on … a computer,' that addition cannot impart

11   patent eligibility."  *Alice*, 134 S. Ct. at 2358 (alterations in original) (citation omitted) (quoting *Mayo*,

12   566 U.S. at 84).  By the same logic, courts have treated "analyzing information by steps people go

13   through in their minds, or by mathematical algorithms, without more, as essentially mental processes

14   within the abstract-idea category."  *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354

15   (Fed. Cir. 2016) (collecting cases).  Similarly, mere computer-based performance of "'well-

16   understood, routine [and] conventional activit[ies]' previously known to the industry" is not

17   inventive.  *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 566 U.S. at 73).[9]

18   **IV.    ARGUMENT**

19         The asserted claims of the True Name patents cannot survive the scrutiny that *Alice* demands.

20   Each claim is directed to the abstract idea of using a known, content-based identifier for basic data-

21   management functions—namely, determining if access to a data item is authorized or licensed (the

22   '310 patent), requesting files that are distributed across a network (the '280 patent), or marking files

23

---

24   [9] A "useful clue" for the second step of the *Alice* framework is whether the asserted claim is "tied to a
      particular machine or apparatus."  *Smart Sys. Innovations v. Chicago Transit Auth.*, 873 F.3d 1364,

25   1375 (Fed. Cir. 2017) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014)).
     "The mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a

26   patent-eligible invention."  *Alice*, 134 S. Ct. at 1358; *Smart Sys.*, 873 F.3d at 1375 (claims that merely
     "disclose the use of generic computer components and machinery" do not satisfy this machine-or-

27   transformation test).  "In other words, the subject patent must disclose the use of an apparatus
     specific to the claimed invention."  *Smart Sys.*, 873 F.3d at 1375; *see also Ultramercial*, 772 F.3d at

28   716 (invalidating claim that was "not tied to any particular novel machine or apparatus, only a
     general purpose computer").

---

for deletion (the '662 patent).  Moreover, the claims lack an "inventive aspect" sufficient to transform these abstract ideas into patent-eligible subject matter because they simply recite generic computer components implementing well-known techniques, including hashing functions.  Judgment should thus enter for Defendants.

## A.   The '310 Patent

The '310 patent is entitled "Controlling Access to Data in a Data Processing System," and the asserted claims—claims 24, 32, 81, 82, and 86[10]—all claim the idea of using a known, content-based identifier (i.e., a message digest function or hash) to control access to content.  *See also* '310 patent at Abstract ("Access to and delivery of licensed content is controlled using content names that were determined based on the content.").

Independent (and asserted) claim 81 is illustrative:

> 81. A device operable in a network of computers, the device comprising hardware including at least one processor and memory, to:
>
> (a)  receive, at said device, from another device in the network, a content-based identifier for a particular sequence of bits, the content-based identifier being based at least in part on a function of at least some of the particular sequence of bits, wherein the function comprises a message digest function or a hash function, and wherein two identical sequences of bits will have the same content-based identifier; and to
>
> (b) compare the content-based identifier of the particular sequence of bits to a plurality of values; and to
>
> (c)  selectively allow said particular sequence of bits to be provided to or accessed by other devices depending on whether or not said content-dependent identifier corresponds to one of the plurality of values.

This claim involves three steps.  The ***first*** limitation recites "receiv[ing]" a content-based identifier from another device in the network.  The content-based identifier is "based at least in part on a function of at least some of" the data in the data item, and is generated using a "message digest function" or a "hash function," which are well-known mathematical equations that can be solved with pen and paper.  In short, this limitation does nothing more than describe receiving an identifier for a

---

[10] As noted above, Plaintiffs assert claims 24 and 32 against only EMC and VMware, and assert claims 81, 82, and 86 against all Defendants here.

1   data item, wherein the identifier is based on a function of the data in the data item itself (which was

2   indisputably known in the art, as discussed below in the context of the step two analysis).  The

3   **second** limitation recites "compar[ing] the content-based identifier" to a "plurality of values."  In

4   other words, this limitation describes nothing more than the conventional step, capable of being

5   performed in the human mind, of determining whether one value is included in a list of multiple

6   values.  Finally, the **third** limitation recites "selectively allow[ing]" the data to be "provided to or

7   accessed by other devices" depending on whether or not the identifier matches one of the values in

8   the list of values.  This limitation does nothing more than state that the system must compare the

9   content-based identifier to a list of identifiers and, based on the results of that comparison, either

10  allow or disallow access to the data, which is also something that is capable of being performed in the

11  human mind.

12          There are only minor differences among the five claims that Plaintiffs assert.  <u>Claim 24</u> recites

13  the use of a "content-dependent name" (again, "based, at least in part" on a message digest function

14  or hash) to determine whether access to a data item is "unauthorized."  <u>Claim 32</u>, which depends

15  from claim 24, adds the limitation that "the data used by the function to determine the content-

16  dependent name of the particular data item comprises of [sic] all of the contents of the particular data

17  item."  As noted above, <u>claim 81</u> similarly recites the use of a "content-based identifier" ("based at

18  least in part" on a message digest function or hash) to "selectively allow" access to data.  <u>Claim 82</u>,

19  which depends from claim 81, adds the limitation that "the particular sequence of bits represent[s]

20  data selected from the group comprising: a file, a portion of a file, a page in memory, a digital

21  message, a portion of a digital message, a digital image, a portion of a digital image, a video signal, a

22  portion of a video signal, an audio signal, a portion of an audio signal, a software product, and a

23  portion of a software product."  Finally, <u>claim 86</u> recites the use of a "digital identifier" ("being

24  based, at least in part" on a message digest function or hash) to control access to content.

**1.      The Asserted Claims of the '310 Patent Fail *Alice* Step One Because They Are Directed to an Abstract Idea.**

26          The asserted claims of the '310 patent are all directed to a patent-ineligible abstract idea:

27  using a content-based identifier to control access to data.  Specifically, each claim describes

28

---

(1) receiving identifiers for data items based on their content, and (2) using those identifiers to control access to the data items.  These are abstract ideas, both standing alone and in combination.

The idea of naming or identifying information—including devising a name based on the information itself—is an abstract concept.  In *OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015), the court found unpatentable claims based on the "abstract idea of compiling, organizing, and transmitting information, using identification codes as shorthand for that information," *id.* at *3.  According to the court, the at-issue patent did not pass the pen-and-paper test:  "Using a pen, paper, and her own brain, a person could write down a list of products, corresponding product codes, and vendor contact information (step 1), organize those codes by vendor (step 2), receive an order from a user containing a product code and quantity of the product desired (step 3), and transmit that order by matching the product code to the vendor contact information using the aforementioned list (step 4)."  *Id.* at *4.  This failure indicates that the relevant claims "comprise a non-patent-eligible abstract idea."  *Id.*  And in *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 319 F. Supp. 3d 818 (E.D. Va. 2018), *aff'd*, 778 F. App'x 882 (Fed. Cir. 2019), the court found unpatentable claims including "determining user information for a user" and "generating a user identifier from the determined user information," *id.* at 822; *see also Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017) (claims describing use of unique identifiers on envelopes or parcels were directed to "abstract idea of using a marking affixed to the outside of a mail object to communicate information about the mail object, i.e., the sender, recipient, and contents of the mail object").  As in *OpenTV* and *Bridge & Post*, the elements of the asserted claims of the '310 patent relate to using unique identifiers for data, which could be performed by a human being in his or her mind or by using a pen and paper.

The idea of controlling access to data items to licensed or authorized recipients is equally abstract.  In fact, this idea is not even unique to computers or the Internet.  Long before computers, people were applying authorization methods to requests for access to sensitive information based on the identity of the requesting party and the information requested.  The use of computers to implement those authorization methods does not change the analysis.  *See Smartflash LLC v. Apple Inc.*, 680 F. App'x 977, 982-983 (Fed. Cir. 2017); *see also Protegrity USA, Inc. v. Netskope, Inc.*, No.

1  15-cv-02515-YGR, 2015 WL 6126599, at *6 (N.D. Cal. Oct. 19, 2015) (holding that claims over

2  "types of access limitations" are directed to abstract ideas that "substantially predate modern

3  computers, arising in contexts such as physical security and access policies").

4      In fact, the purported solution of the '310 patent focuses on ideas that could be practiced

5  *without* the use of a computer.  Specifically, the asserted claims determine whether access should be

6  allowed by simply matching one value (the identifier for a data item) to a list of values.  If the first

7  value appears on the list, the recipient may access the data.  This could equally be performed

8  manually as it could with a computer.  *See, e.g.*, *CyberSource Corp. v. Retail Decisions, Inc.*, 654

9  F.3d 1366, 1372 (Fed. Cir. 2011) (one indication that claim is abstract is when it "can be performed

10  in the human mind, or by a human using a pen and paper"); *Symantec Corp.*, 838 F.3d at 1318

11  ("[T]here is nothing in the claims themselves that foreclose them from being performed by a human,

12  mentally or with pen and paper.").

13      Consistent with these principles, courts have repeatedly found that regulating access to

14  information in this way—including by using a name or identifier to determine if access is licensed or

15  authorized—is abstract.  As the Federal Circuit has emphasized, "[r]emotely accessing and retrieving

16  user-specified information is an age-old practice that existed well before the advent of computers and

17  the Internet."  *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017).

18  And applying restrictions on access to that data does nothing to rescue the claims.  In *Prism Techs.*

19  *LLC v. T-Mobile USA, Inc.*, the Federal Circuit agreed that "[u]nder [*Alice*] step one, the district court

20  properly concluded that the asserted claims are directed to the abstract idea of 'providing restricted

21  access to resources.'"  696 F. App'x 1014, 1017 (Fed. Cir. 2017).  And in *Smartflash*, the Federal

22  Circuit similarly found that claims directed to "the abstract idea of conditioning and controlling

23  access to data based on payment" were unpatentable under Section 101.  680 F. App'x at 982-983;

24  *see also Umbanet, Inc. v. Epsilon Data Mgmt., LLC*, 263 F. Supp. 3d 647, 653 (E.D. Tex. 2017)

25  (describing concept of "enabling selective access to a message" as "a generally abstract idea");

26  *Preservation Wellness Techs. LLC v. Allscripts Healthcare Solutions*, No. 2:15-CV-1559-WCB, 2016

27  WL 2742379, at *7 (E.D. Tex. May 10, 2016) (Bryson, J, sitting by designation) ("The 'concept of

28  record access and management' is an abstract idea ...."); *Jericho Sys. Corp. v. Axiomatics, Inc.*, No.

3:14-CV-2281-K, 2015 WL 2165931, at *4 (N.D. Tex. May 7, 2015) (describing process of "a user entering a request for access, looking up the rule for access, determining what information is needed to apply the rule, obtaining that information, and then applying the information to the rule to make a decision" as "an abstract idea," namely "that people who meet certain requirements are allowed to do certain things").

Indeed, this Court also has rejected the patentability of similar claims.  In *OpenTV, Inc. v. Apple Inc.*, the asserted patents related to DRM and authentication features "to secure the delivery process of digital content."  No. 5:15-cv-02008-EJD, 2016 WL 344845, at *1 (N.D. Cal. Jan. 28, 2016).  One patent related to "access rights" involving granting permission to use features of an application based on a series of authentication steps.  *Id.* at *1-2.  Similarly, the other patent involved "renewing access rights to digital content after the user initially inputs the necessary information into a database."  *Id.* at *2.  The Court found the challenged claims of both patents invalid under Section 101, noting that "[t]he practice of controlling access to information by verifying credentials (via well-known encryption methods) is neither novel nor specific to interactive television systems."  *Id.* at *5.

For these reasons, the asserted claims of the '310 patent are plainly directed to a patent-ineligible abstract idea: the idea of using a content-based identifier to control access to data.

## 2. The Asserted Claims of the '310 Patent Lack Any "Inventive Concept" as Required Under *Alice* Step Two.

The asserted claims of the '310 patent also contain no "inventive concept" sufficient to transform the abstract idea into patent-eligible subject matter.

***First***, the claims merely apply the abstract idea of controlling access to data to well-known, generic computer technology.  The '310 patent does not describe or claim any specialized components or computer technologies for implementing this abstract idea.  The claims instead recite generic computer components, such as "hardware" and "one or more processors" (claims 24 and 32), or "a device," "network of computers," "hardware," "at least one processor," and "memory" (claims 81, 82, and 86).  These generic components cannot provide an inventive concept.  *Alice*, 134 S. Ct. at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."); *see also Smart Sys. Innovations v. Chicago Transit Auth.*, 873 F.3d

1    1364, 1375 (Fed. Cir. 2017) (claims that merely "disclose the use of generic computer components

2    and machinery" do not satisfy this machine-or-transformation test); *Intellectual Ventures I LLC v.*

3    *Capital One Bank*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("Instructing one to 'apply' an abstract idea

4    and reciting no more than generic computer elements performing generic computer tasks does not

5    make an abstract idea patent-eligible."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed.

6    Cir. 2014) ("[A]dding a computer to otherwise conventional steps does not make an invention patent-

7    eligible.").[11]

8         ***Second***, the use of a "content-dependent name" (claims 24 and 32), "content-based identifier"

9    (claims 81 and 82), or "digital identifier" (claim 86)—found in each asserted claim and generated

10   through a "message digest function or a hash function"—does not supply the necessary inventive

11   concept for the '310 patent.  As noted above with respect to *Alice* step one, the use of content-based

12   identifiers is itself an abstract idea.  But even putting that aside, the use and generation of computer

13   functions capable of generating such content-based identifiers—such as the "message digest function

14   or [] hash function" listed in the asserted claims—are well known and not inventive.  *See, e.g.*, *Smart*

15   *Sys.*, 873 F.3d at 1374 ("The '003 patent teaches the use of a 'processor,' an 'interface,' 'memory,'

16   and 'data,' including '***hash identifier[s]***.' … When claims like the Asserted Claims are 'directed to

17   an abstract idea' and 'merely requir[e] generic computer implementation,' they 'do[] not move into

18   section 101 eligibility territory.'" (alterations in original) (emphasis added) (citations omitted)));

19   *Intellectual Ventures I LLC v. Erie Indem. Co.*, 200 F. Supp. 3d 565, 576 (W.D. Pa. 2016) ("Those

20   claims only specify the type of identification value ('checksum') generated, the type of files that

21   might be selected, or the processing the files will undergo.  All are routine computer functions."),

22   *aff'd*, 711 F. App'x 1012 (Fed. Cir. 2017).

23

24   _____

25   [11] Another indication that the asserted claims are directed to unpatentable subject matter is that they
     fail the "machine-or-transformation" test.  *See Bilski v. Kappos*, 561 U.S. 593, 600, 604 (2010).  A
     "useful and important clue" in determining if a patent claims eligible subject matter is whether the
26   process claimed "is tied to a particular machine or apparatus" or "transforms a particular article into a
     different state or thing."  *Id.*  Here, the asserted claims do not involve any particular computer
27   components, software, or database.  These generic references to "computer components and
     machinery" do not come close to satisfying the machine-or-transformation test.  *See Smart Sys.*, 873
28   F.3d at 1375; *accord Ultramercial*, 772 F.3d at 716 (claims failed the test where "not tied to any
     particular novel machine or apparatus, only a general purpose computer").

1    The intrinsic record—including the IPR proceedings that confirmed that the content-based

2    identifiers recited in the '310 patent claims were well known in the art—also provides extensive

3    evidence reinforcing the lack of patent eligibility under Section 101.  The PTAB found, in six

4    separate IPRs, that using content-based identifiers created by applying "a binary hash algorithm" to

5    the contents of a data item was well known in the prior art.  *See, e.g.*, Ex. A ('791 Final Written

6    Decision) at 15, 54; *see also* Ex. B ('280 Final Written Decision) at 17 (confirming it was known to

7    "us[e] an identifier to identify and request a record stored in a database," including by using "a hash

8    of contents of the binary object, itself"); *supra* Section II.B., pp. 5-6 (citing other IPRs).[12]  The

9    Federal Circuit affirmed these findings.  Ex. G (Federal Circuit judgment).  Even in the appeals from

10   the '310 IPR, the Federal Circuit confirmed that the prior art disclosed the use of content-based

11   identifiers.  *See, e.g.*, *PersonalWeb*, 917 F.3d at 1379 ("Woodhill explains that the critical feature of

12   the Binary Object Identifier is that, because it is based on the contents of the binary object, the

13   identifier changes when the contents of the binary object change.").

14   ***Third***, the remaining limitations of the asserted claims also recite activities that are well-

15   understood, routine, conventional, and non-inventive, including:

16   - *"using a processor"* (claims 24 and 32);

17   - *receiving data*:  "receiving … a request regarding a particular data item" (claims
18     24 and 32); "receiv[ing] … a content-based identifier for a particular sequence of
     bits" (claims 81 and 82); or "receiv[ing] … a digital identifier for a particular
19     sequence of bits" (claim 86);

20   - *comparing data*:  "causing [a] content-dependent name … to be compared to a
     plurality of values" (claims 24 and 32); or "compar[ing] the content-based
21     identifier … to a plurality of values" (claims 81 and 82);

22   - *making a determination*:  "determining whether or not access to the particular data
     item is unauthorized" (claims 24 and 32); or "determining … whether the content-
23     dependent name of [a] particular data item corresponds to at least one of [a]
     plurality of values" (claims 24 and 32); and

24   - *granting or denying access*:  "not allowing [a] particular data item to be provided
     … or accessed" (claims 24 and 32); "selectively allow[ing] said particular
25     sequence of bits to be provided or accessed by other devices depending on whether

26   _____

27   [12] These IPR materials, including PTAB decisions and party filings, are subject to judicial notice.
     *See, e.g.*, *Atlas IP LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-05469-EDL, 2016 WL 1719545, at *1
     n.1 (N.D. Cal. Mar. 9, 2016); *see also Nichia Corp. v. Vizio, Inc.*, No. 16-cv-00545-SJO, 2017 WL
28   3485767, at *2 n.1 (C.D. Cal. Feb. 2, 2017).

1

2

3

or not said content-dependent identifier corresponds to one of the plurality of
values" (claims 81 and 82); or "selectively allow[ing] said particular sequence of
bits to be provided or accessed by other devices in the system, based at least in part
on whether or not the digital identifier … corresponds to a value in a plurality of
values" (claim 86).[13]

4   These activities are all routine steps that were previously known in software design.  *See, e.g.*, *In re*

5   *TLI Commc'ns, LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016) ("[For the second step of *Alice*

6   to be satisfied,] the components must involve more than [the] performance of 'well-understood,

7   routine, conventional activit[ies]' previously known in the industry." (third alteration in original)

8   (quoting *Alice*, 134 S. Ct. at 2359)); *Umbanet*, 263 F. Supp. 3d at 653 ("[T]he general idea of

9   providing access to information according to a characteristic about the recipient or viewer of that

10  information was well-known …."); *Erie Indem.*, 200 F. Supp. 3d at 576 ("Selecting files based on

11  identifiers and matching different files/identifiers is just what computers do.  There is nothing

12  inventive about it.").

13          Similarly, the limitations added by dependent claims 32 and 82 are not material for purposes

14  of Section 101.  Claim 32, which depends from claim 24, adds only the limitation that "the data used

15  by the function to determine the content-dependent name of the particular data item comprises of all

16  of the contents of the particular data item."  This claim merely describes the data used as the input for

17  the hash function to generate the unique identifier.  And claim 82, which depends from claim 81,

18  adds only the limitation that "the particular sequence of bits represent[s] data selected from the group

19  comprising: a file, a portion of a file, a page in memory, a digital message, a portion of a digital

20  message, a digital image, a portion of a digital image, a video signal, a portion of a video signal, an

21  audio signal, a portion of an audio signal, a software product, and a portion of a software product."

22  This claim merely describes specific applications for the claimed invention by listing well-known

23  types of digital data (e.g., videos and images) that can be identified and accessed.  These limitations

24  do not add any "inventive concept."  *See, e.g.*, *Bilski v. Kappos*, 561 U.S. 593, 612 (2010)

25  ("[L]imiting an abstract idea to one field of use … did not make the concept patentable.").

26

27

28

---

[13] The Court need not address each individual claim when there is a representative claim and "all
claims are 'substantially similar and linked to the same abstract idea.'"  *Content Extraction &
Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (quoting *Content
Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, Nos. 12-cv-2501, -6960, 2013 WL
3964909, at *5 (D.N.J. July 31, 2013)).

1    In short, each asserted claim of the '310 patent could be replicated solely by "using a pencil

2    and paper" and thus cannot reasonably be said to add anything inventive beyond the abstract idea of

3    using a content-based identifier to control access to data items.  *Capital One Bank*, 792 F.3d at 1368;

4    *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1152 (Fed. Cir. 2016) (claims

5    failed step two where they introduced no "technical advance or improvement"); *Digitech Image*

6    *Techs. LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("Without additional

7    limitations, a process that employs mathematical algorithms to manipulate existing information to

8    generate additional information is not patent eligible.").  The asserted claims do not survive *Alice* step

9    two because the claim elements, when considered individually or as an ordered combination, do not

10   amount to "significantly more" than the ineligible concept itself.  *Alice*, 134 S. Ct. at 2355.

11   **B.    The '280 Patent**

12   The '280 patent relates to and has the same specification as the '310 patent.  Like the '310

13   patent, the title of the '280 patent—"Identifying and Requesting Data in Network Using Identifiers

14   Which Are Based on Contents of Data"—specifies the use case: using content-based identifiers to

15   request files.  As described in the '280 patent:

16   In a system in which a set of data items are distributed across a network of
     servers, at least some of the data items being cached versions of data items
17   from a source server, ***a content delivery method includes determining a
     data identifier for a particular data item, the data identifier being***
18   ***determined using a given function of the data comprising the particular
     data item; and responsive to a request for the particular data item, the***
19   ***request including at least the data identifier of the particular data item,***
     providing the particular data item from a given one of the servers of the
20   network of servers.

21   '280 patent, Abstract (emphasis added).

22   Across these cases, Plaintiffs assert claims 15, 16, 31, and 32 of the '280 patent.  Claim 15,

23   which depends from claim 10 (canceled in an *Ex Parte* Reexamination Certification issued by the

24   Patent Office), recites as follows:

25   10. A content delivery method, comprising:

26   distributing a set of data files across a network of servers;

27   determining a data identifier for a particular data file, the data
        identifier being determined using a given function of the data,
28      wherein said data used by the given function to determine the data
        identifier comprises the contents of the particular data file; and

---

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**
Case Nos. 5:13-cv-01317; 5:13-cv-01356; 5:13-cv-01358-EJD                                18

1

2      in response to a request for the particular data file, the request
          including at least the data identifier of the particular data file,
          providing the particular data file from a given one of the servers of

3          the network of servers, said providing being based on the data
          identifier of the particular data file.

4      15. A method as in claim 10 further comprising:

5      resolving the request for the particular data file based on a measure of
          availability of at least one of the servers.

6          Claim 16, which depends from claim 15, additionally requires that the "measure of

7 availability" is based on measurements of "bandwidth," "cost of a connection to the server," or

8 "reliability of a connection to the server."  Claims 31 and 32 are asserted only against Facebook.

9 Claim 31 is nearly identical to claim 10 but recites the use of the well-known "MD5 hash" to identify

10 and request a data file.  Claim 32 depends from claim 31 and recites the same additional limitation as

11 claim 15.

12          All asserted claims of the '280 patent are invalid because they fail the two-step *Alice*

13 framework.  With respect to *Alice* step one, claim 10 (from which claims 15 and 16 depend) and

14 claim 31 (from which claim 32 depends) encompass the same abstract idea of using content-based

15 identifiers (referred to as the "data identifier" in the '280 patent) to locate data as discussed above for

16 the '310 patent—whether it be a generic "data identifier" (claim 10) or an "MD5 hash" (claim 31).

17 That same content-based identifier is then used to provide the data from a server in response to a

18 request.  But this is similar to the data-retrieval aspect of the '310 patent.  That is, for purposes of a

19 Section 101 analysis, there is no material difference between providing access to a sequence of bits

20 based on an identifier (as claimed in the '310 patent) and providing a file based on an identifier (as

21 claimed in the '280 patent)—both provide data based on an identifier, and both are abstract ideas.[14]

22 The independent claims of the '280 patent therefore fall squarely within the same category of abstract

23 ideas of identifying and requesting information discussed above.  *See, e.g.*, *Erie Indem.*, 850 F.3d at

24 1330 (finding claimed invention of using identifiers to retrieve data to be abstract).

25

26

----

27 [14] Returning to the library catalog analogy, for centuries, humans have cataloged books using unique identifiers, which are then used to retrieve books in response to requests from library patrons.  Such an idea is abstract and not patent-eligible, in part because it can be performed without a computer.

28 *See CyberSource*, 654 F.3d at 1372 (one indication that a claim is abstract is when it "can be performed in the human mind, or by a human using a pen and paper").

Dependent claims 15, 16, and 32 are similarly abstract. These claims add limitations requiring that the requests for files are resolved based on "a measure of availability of at least one of the servers" (claims 15 and 32) and "a measurement of bandwidth[,] … a measurement of a cost of a connection to the server[,] [and/or] a measurement of a reliability of a connection to the server" (claim 16). To continue the library analogy, the limitations added in these dependent claims equate to the idea of retrieving a book based on whether the library is open, how many requests the librarian can process at a time, or how many copies of a book may be available. Accordingly, using a measure of whether the server is available (by bandwidth, cost of a connection, or reliability of a connection) to resolve a request for data using a content-based identifier does not render the abstract idea patent eligible. *See Citrix Sys., Inc. v. Avi Networks, Inc.*, No. 17-cv-1843-LPS, 2019 WL 582480, at *6-8 (D. Del. 2019) (claims directed to method of "identify[ing] whether [computer] network service was available by determining whether the service's response time exceeds the service's average response time," *id.* at *1, were directed to patent-ineligible "abstract idea of using a dynamic response time to determine availability," *id.* at *6). And while these claims may add limitations relating to properties of *servers*, those additional limitations simply reflect the implementation of an abstract idea in the context of a computer system. *Alice*, 134 S. Ct. at 2357-58 (holding that merely implementing an abstract idea on a computer cannot impart patent eligibility).

Under step two, the asserted claims of the '280 patent do not contain any inventive concept that would render them patent eligible under Section 101. Like the '310 patent, the asserted claims of the '280 patent rely solely on well-known generic components, such as "data files," a "network," "servers," and "data identifier[s]." In fact, the claims state that a generic "data identifier" is determined for a generic "data file" that is distributed across a generic "network of servers," and a generic "request" is used to provide the data file—all of which is "[w]holly generic computer implementation." *Alice*, 134 S. Ct. at 2357. Further, claims 15, 16, and 32 also fail to specify *how* the claimed methods are supposed to resolve the request based on a measure of availability of the servers. The '280 patent refers to this measure of availability in only two places, neither of which provides any teaching as to how to actually measure availability; they refer instead to "optimizations involving general availability of the source, access time, bandwidth, and transmission cost." '280

patent at 16:58-60; *accord id.* at 17:20-22.  These are generic properties of networked systems, and the claims state nothing more than an aspirational, functional goal of measuring availability of servers without specifying any technical details on how to implement it.  *See Affinity Labs of Texas v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem."); *see also Citrix Sys.*, 2019 WL 582480, at *8 (finding that the claim was not inventive in the absence of "any concrete or persuasive explanation of how determination of availability is a problem specifically arising in the realm of computer networks, or how the combination of technological elements recited in the claims is unconventional." (internal quotation marks omitted)).  Claim 16 also adds nothing more than generic properties of servers.  Because these limitations add only generic and conventional components of servers to the abstract ideas of claims 10 and 31, they do not provide an inventive concept under *Alice* step two.

Also, as discussed above for the '310 patent, using content-based identifiers generated through a "MD5 hash" function (claim 31) was well-known and not inventive.  In fact, the specification identifies various message digest algorithms common in the art, which are all based on mathematical functions applied to input data.  *See, e.g.*, '280 patent at 12:61-65 ("A family of functions with the above properties are the so-called message digest functions, which are used in digital security systems as techniques for authentication of data.  These functions (or algorithms) include MD4, MD5, and SHA.").  Moreover, the IPR proceedings confirmed that such hash algorithms were well known.  *See* Ex. B ('280 Final Written Decision) at 17-18, 27 (confirming it was known to "us[e] an identifier to identify and request a record stored in a database," including by using "a hash of contents of the binary object, itself," *id.* at 17); *supra* Sections II.B and IV.A.2, pp. 5-6, 16 (citing IPRs).  Accordingly, related case law has held that using hashing algorithms is routine and cannot itself supply an inventive concept sufficient to establish patentability.  *See, e.g.*, *Smart Sys.*, 873 F.3d at 1374; *Erie Indem.*, 200 F. Supp. 3d at 576.  Thus, for the foregoing reasons, claims 15, 16, 31, and 32 of the '280 patent do not contain any concrete technological invention and are invalid.

---

1

**C.      The '662 Patent**

2          The '662 patent relates to both the '310 and '280 patents discussed above.[15]  Again, all three

3  share the same specification.

4          The '662 patent is directed to de-duplicating files.  *See* '662 patent, Title ("De-Duplication of

5  Data in a Data Processing System").  To perform that de-duplication, the '662 patent relies on the

6  same high-level and well-known idea underlying the other True Name patents: using content-based

7  identifiers for data management.  As reflected in the Abstract,

8              In a data processing system, a method includes deleting a particular copy
            of a data item when at least one other copy of the data item is available.
9              ***The presence of another copy of the data item is determined, at least in
            part, based on an identifier for the data item, the identifier having been
10            computed using all of the data in the data item and only the data in the
            data item***, wherein two identical data items in the data processing system
11            will have identical identifiers.  The particular copy of the data item may be
            deleted if another copy of the data is determined to be present on another
12            processor in the system or on the same processor.  The identifier of the
            data item is computed using a function such as a message digest or hash
13            function which may be: MD4, MD5, or SHA.

14  (Emphasis added.)  In short, the idea of the '662 patent is to use content-based identifiers generated

15  via standard hashing algorithms to determine whether duplicate copies exist and, if so, delete them.

16          Claim 33 is the only relevant claim from the '662 patent and is asserted against only

17  Google.[16]  Claim 33 broadly applies the same idea in a file system storing file data in segments.

18  Although the claim is lengthy, it focuses on the simple idea of using a content-based identifier to

19  mark files for deletion.  The claim recites tracking which segments at which location correspond to

20  that file data, and identifying which file data to delete in response to a deletion request.  Specifically,

21  claim 33 provides as follows:

22

23

---

24  [15] Specifically, the '662 patent is in a line of continuation applications from the '280 patent and is a
    divisional of the application from which the '310 patent also derives.  In effect, the '310 and '662
25  patents are siblings, and the '280 patent is a grandparent.

26  [16] Notably, the infringement allegations relate to Google's Colossus File System; however, that
    system was not identified as the accused instrumentality in Plaintiffs' operative infringement
27  contentions.  For that reason, Google filed a motion to strike the related opinions of Plaintiffs' expert,
    Dr. Kevin Almeroth.  *See* Dkt. Nos. 316-04 (motion) and 323-03 (reply).  That motion was pending
    when the Court stayed Plaintiffs' case against Google.  A ruling of invalidity here would moot that
28  motion; alternatively, striking Plaintiffs' newfound infringement theory pursuant to the Patent Local
    Rule would moot the Section 101 challenge.

A file system comprising:

(i) a plurality of servers to store file data as segments; and

(ii) first data that includes file identifiers for files for which the file data are stored as segments; and

(iii) second data that maps the file identifiers to the segments to which the file identifiers correspond; and

(iv) location data that identifies which of the plurality of servers stores which of the segments; and

(v) a table including file identifiers for files in the file system, said table including a corresponding status for at least some of the files in the file system,

(vi) at least one computer comprising hardware in combination with software and connected to the plurality of servers, the at least one computer programmed:

(A) to receive a request to delete a particular data item in the file system;

(B) to ascertain, in response to said request, a digital data item identifier corresponding to said particular data item, said particular data item consisting of an arbitrary sequence of bits consisting of a sequence of non-overlapping segments, each of said segments in said sequence being stored on multiple servers of the plurality of servers in the file system, said digital data item identifier being based at least in part on a given function of the data comprising the particular data item, said given function comprising a hash function;

(C) to update an entry in said table corresponding to said particular data item to reflect deletion of said particular data item in the file system, said entry including at least said digital data item identifier of said particular data item.

At the core of claim 33 is the same basic idea claimed in the '310 and '280 patent: using content-based identifiers to locate data. But in the case of claim 33 of the '662 patent, the purpose is not to control access to the data (as in the '310 patent) or to identify and request data (as in the '280 patent); rather, the abstract idea is using content-based identifiers to mark data for deletion. For the reasons explained above as to the '310 and '280 patents, such an abstract idea is not patent-eligible.

The question thus turns to whether claim 33 of the '662 patent reflects an "inventive concept" sufficient to transform the abstract idea into patent-eligible subject matter. It does not. Despite the length of the claim and the number of limitations, claim 33 suffers from the same lack of inventive

concept.  That is, claim 33 of the '662 patent simply recites a variety of well-known, generic computer components—e.g., "a plurality of servers"; data "segments"; file "location data"; and a data "table."  None of these elements describes or claims any specialized components or computer technologies for implementing the abstract idea of using content-based identifiers to mark data for deletion.  To the contrary, the elements of claim 33 amount to generic window dressing for implementing the abstract idea in a conventional networked computer system.  As noted above, such components cannot provide an inventive concept.  *See supra* Section IV.A.2, pp. 14-16 (citing *Alice*, 134 S. Ct. at 2358; *Smart Sys.*, 873 F.3d at 1375; *Capital One Bank*, 792 F.3d at 1368; *Ultramercial*, 772 F.3d at 717).

As also discussed with respect to the '310 and '280 patents, using content-based identifiers does not provide the necessary inventive concept for claim 33 of the '662 patent because the algorithms that generate such content-based identifiers—specifically the "hash function" identified in claim 33—are well known.  Again, the specification identifies common hash functions, *see, e.g.*, '662 patent at 12:61-65; the PTAB confirmed that hash algorithms were well known in the art, *see supra* Sections II.B and IV.A.2, pp. 5-6, 16; and hashing algorithms have been deemed routine in the related case law, *see, e.g.*, *Smart Sys.*, 873 F.3d at 1374; *Erie Indem.*, 200 F. Supp. 3d at 576.

In sum, for reasons similar to those discussed in connection with the asserted claims of the '310 and '280 patents, claim 33 of the '662 patent is invalid under Section 101.

## V.     CONCLUSION

Because the asserted True Name patents claim an inherently abstract idea with no inventive steps, Defendants respectfully request that the Court invalidate the asserted claims of the '310, '280, and '662 patents as patent ineligible under 35 U.S.C. § 101.

1   Dated:  November 22, 2019                 KEKER, VAN NEST & PETERS LLP

2
                            By:   */s/ Robert A. Van Nest*

3                                 ROBERT A. VAN NEST
                                 MATTHIAS A. KAMBER

4                                 REID P. MULLEN
                                 MAYA KARWANDE

5                                 LEAH PRANSKY

6
                                 Attorneys for Defendants

7                                 GOOGLE LLC and YOUTUBE, LLC

8   Dated:  November 22, 2019                 ARNOLD & PORTER LLP

9
                            By:   */s/ Michael A. Berta*

10                                  MICHAEL A. BERTA
                                 NICHOLAS H. LEE

11

12                                 Attorneys for Defendants
                                 GOOGLE LLC and YOUTUBE, LLC

13   Dated:  November 22, 2019                 COOLEY LLP

14
                            By:   */s/ Heidi L. Keefe*

15                                  MICHAEL G. RHODES

16                                 HEIDI L. KEEFE
                                 MARK R. WEINSTEIN

17                                   REUBEN H. CHEN
                                 LAM K. NGUYEN

18                                 DENA CHEN

19
                                 Attorneys for Defendant

20                                 FACEBOOK, INC.

21   Dated:  November 22, 2019                 WILMER CUTLER PICKERING
                                 HALE AND DORR LLP

22

23                          By:   */s/ Robert Galvin*

24                                  ROBERT GALVIN
                                 WILLIAM F. LEE (*pro hac vice*)

25                                  CYNTHIA D. VREELAND (*pro hac vice*)
                                 PETER DICHIARA (*pro hac vice*)

26
                                 Attorneys for Defendants and

27                                 Counterclaim-Plaintiffs
                                 EMC CORPORATION

28                                 AND VMWARE, INC.

## ATTORNEY ATTESTATION

I, Robert A. Van Nest, am the ECF User whose ID and password are being used to file this document. In compliance with N.D. Cal. Civil L.R. 5- 1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other signatories.

By:   */s/ Robert Van Nest*
Robert Van Nest

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2019, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   */s/ Robert Van Nest*
Robert Van Nest